## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | :    **CASE NO.** |
| **v.** | : |
| | : |
| **THOMAS ABDALLAH (A.K.A. TOM ABRAHAM), KENNETH GRANT, KGTA PETROLEUM, LTD., MARK M. GEORGE, JEFFREY L. GAINER, and JERRY A. CICOLANI, JR.,** | :    **JURY DEMANDED** |
| | : |
| **Defendants,** | : |
| | : |
| **NANCY GAINER, NATG, LLC, KELLY C. HOOD, and TURNBURY CONSULTING GROUP, LLC,** | : |
| | : |
| **Relief Defendants.** | : |

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows:

1.     This case centers on a fraudulent scheme perpetrated by Defendants Thomas Abdallah (a/k/a Tom Abraham), Kenneth Grant and their company KGTA Petroleum, Ltd.  ("KGTA").  Grant and Abdallah marketed KGTA to investors as a petroleum company that earns profits by buying and reselling crude oil and refined fuel products (including jet fuel). They told investors that they had relationships with *bona fide* third party purchasers and that they would use investor funds to buy fuel at a discount that would then be sold at a substantial profit to those *bona fide* purchasers.

2.     The KGTA investment "opportunity" offered the best of both worlds: astronomical returns – typically between 2% to 4% per month (or 24-48% annualized) – with no market risk.

3.     Grant and Abdallah helped convince prospective investors to buy KGTA promissory notes ("KGTA Notes") by promising an important safeguard: the investment funds and the returns would flow through an escrow account monitored by attorney Mark George, who acted as the escrow agent.

4.     In the Escrow Agreements with investors, Grant, Abdallah, and George promised that (a) investor funds would be held in George's IOLTA account until KGTA received a "firm Purchase Order from a bona fide third party purchaser," (b) investor funds would be released from escrow only to pay invoices for the purchase of fuel by KGTA, and (c) proceeds from KGTA's resale of the fuel would then be sent straight to the escrow account from which investors would be paid their returns before KGTA received any excess.

5.     Between October 8, 2012 and February 2014, KGTA raised at least $20.73 million from investors.

6.     The KGTA oil business was a sham and the escrow safeguard was a mirage. In reality, Grant and Abdallah operated KGTA as a Ponzi scheme and George never followed the promised escrow procedures.  The purchase orders did not exist, KGTA did not sell fuel or oil to its "major buyers," and KGTA did not generate revenue through the purchase and resale of oil products. Investor funds were not held in escrow pending legitimate purchase orders. Instead, George distributed investor cash directly to KGTA. KGTA used some of the funds raised from new investors to pay fake "returns" to old

investors. Grant and Abdallah also took some of the investment proceeds for their own personal use – including car payments, country club dues, and over $200,000 in cash withdrawals.

7.     By lying to investors about KGTA's business, running KGTA as a fraudulent Ponzi scheme, and lying to investors about the escrow safeguard, Defendants Grant, Abdallah and KGTA committed securities fraud. Defendant George also committed fraud when he lied to investors about his role in controlling distributions from the escrow account.

8.     Defendants Grant, Abdallah and KGTA also violated the registration provisions of federal securities law. They offered and sold the KGTA Notes without providing the investing public with the protection of a registration statement (and related disclosures regarding KGTA's finances and operations).

9.     In most instances, Grant and Abdallah offered and sold the fraudulent KGTA Notes to prospective investors through Defendants Jeffrey Gainer and Jerry Cicolani – two registered representatives with a Cleveland-based broker-dealer. Gainer and Cicolani found investors for KGTA, set up meetings with Grant and Abdallah, relayed information about KGTA to prospective investors, and obtained investor signatures on the agreements that memorialized the investment.

10.     In helping Grant and Abdallah find investors for the KGTA Notes, Defendants Gainer and Cicolani committed their own violations of federal securities law.

11.     First, Gainer and Cicolani joined in the registration violations of Defendants KGTA, Grant, and Abdallah; they offered and sold KGTA Notes to investors without a registration statement on file or in effect.

12.     Second, Gainer and Cicolani acted as unregistered broker-dealers. They did not sell the KGTA Notes through their broker-dealer firm.  Instead, they engaged in a practice called "selling away." They kept the KGTA transactions secret from their employer, ignored their employer's policies on selling private placements like the KGTA Notes, sold the KGTA Notes on their own, and then they kept the proceeds for themselves.

13.     Third, Gainer and Cicolani committed fraud in the course of marketing the KGTA Notes: they (1) recklessly offered and sold the fraudulent Notes despite glaring "red flags" that signaled that KGTA was a scam, and (2) hid from investors the fact that they were being paid enormous fees by KGTA to sign up investors – fees that were paid out of a 5% gross monthly "return" that would otherwise have been paid to the investor. There was a zero-sum game between the fees and investor returns; if Cicolani and Gainer negotiated a higher commission for bringing in a particular investor, that investor's returns were reduced by a corresponding amount. Gainer and Cicolani hid that fact from the investors that they recruited.

14.     Gainer and Cicolani reaped massive fees by selling the bogus, unregistered KGTA Notes to investors. Since October 2012, Gainer has been paid approximately $2 million in fees while Cicolani has taken in over $4 million in fees. In other words, they have been paid approximately 29% of all funds raised from investors for KGTA.

15.     Those massive, illicit fees have been funneled through entities owned by Gainer's wife (Relief Defendant Nancy Gainer) and Cicolani's girlfriend (Relief Defendant Kelly Hood).

4

16.     As recently as March 19, 2014 KGTA was taking in new investor money. In fact, even after he was confronted by law enforcement, Defendant Grant continued to tell investors that KGTA is in the oil trading business and that *bona fide* sales were imminent.

17.     The SEC brings this lawsuit to immediately stop Defendants' violations of the federal securities laws, to prevent further harm to investors, and to seek disgorgement and civil penalties stemming from Defendants' wrongdoing, among other remedies.

## JURISDICTION AND VENUE

18.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)], and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)].

19.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

20.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The acts, practices and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Ohio and elsewhere.

21.     Defendants each reside and transact business within the Northern District of Ohio.

22.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

23. **Kenneth A. Grant**, age 66, is a resident of Copley, Ohio. Grant is co-owner and a managing member of KGTA.

24. **Thomas Abdallah, a/k/a Thomas Abraham**, age 49, is a resident of Brunswick, Ohio. Abdallah owns and operates KGTA along with Kenneth Grant. Defendant Abdallah also uses the legal name Thomas Abraham.

25. **KGTA Petroleum, Ltd.**, is an Ohio limited liability company formed in 2008 as Susannah, LLC, and renamed KGTA Petroleum, Ltd. on March 22, 2012. KGTA's registered agent is Kenneth Grant's daughter, Susan Grant Kalal, and its registered address is a home owned by Susan Grant Kalal and her husband.

26. **Mark M. George**, age 56, is a resident of Independence, Ohio. George is an attorney licensed to practice law in Ohio. George served as Escrow Agent for investments in KGTA and was responsible for disbursing the escrowed funds which were placed into his IOLTA trust account.

27. **Jeffrey L. Gainer**, age 49, is a resident of Akron, Ohio. Gainer is a registered representative with Prime Solutions Securities, Inc. ("PSSI") – a Cleveland-based registered broker-dealer. PSSI has suspended Gainer in connection with this matter. Gainer has been employed in the securities industry since 2001.

28. **Jerry A. Cicolani, Jr.**, age 45, is a resident of Wooster, Ohio. Cicolani is a registered representative with PSSI, but has been suspended by the firm in connection with this matter. Cicolani has been employed in the securities industry since 1991.

## RELIEF DEFENDANTS

29.    **Nancy Gainer**, age 50, is a resident of Akron, Ohio.  She is married to Jeffrey

Gainer. She is also the owner of NATG, LLC which received over $1.6 million from

KGTA from October 2012 through March 2014.

30.    **NATG, LLC** is an Ohio limited liability company owned by Nancy Gainer.

According to its articles of organization filed with the Ohio Secretary of State, NATG, LLC

provides "[s]ales and consulting services to support businesses."

31.    **Kelly C. Hood**, age 35, has residences in Richfield, Ohio and Naples,

Florida.  Hood became a registered representative with PSSI in 2012, but was suspended by

the firm in connection with this matter.  She is also the owner of Turnbury Consulting

Group, LLC which received over $3.5 million from KGTA between October, 2013 and

March 2014. Ms. Hood is Defendant Cicolani's girlfriend.

32.    **Turnbury Consulting Group, LLC** is a limited liability company owned by

Kelly Hood and registered in both Ohio and Florida.

## FACTS

33.    Since at least mid-2010, Defendants Adbullah and Grant have owned and

operated entities that purport to be in the oil trading business.

34.    From 2010 until November 2012, Abdallah and Grant claimed to conduct oil

trading through two wholly-owned entities – S&J Management and SJGK, LLC.

35.    On March 22, 2012, Grant and Abdallah rechristened another one of their

wholly-owned entities, changing its name to KGTA Petroleum, Ltd. Grant, Abdallah and

KGTA represented that KGTA was in the business of purchasing crude oil and refined fuel

7

at a discount and reselling those products at a profit to meet the fuel needs of its corporate customers.

36.    Throughout KGTA's existence, Grant and Abdallah have been the sole owners and sole officers of KGTA.

37.    While KGTA is purportedly in the business of buying and reselling large amounts of oil and fuel, it has no employees other than Grant and Abdallah, no transportation infrastructure, no storage facilities, and is run out of the home offices of Grant and Abdallah.

38.    Starting no later than November 2012, Abdallah, Grant and KGTA – often using the services of Defendants Gainer and Cicolani – started selling investment interests in KGTA to prospective investors.

39.    In substance, the investment interests were in the form of promissory notes – albeit at an extraordinary rate of interest. The investor put up an agreed amount of principal and was promised a guaranteed, fixed return typically between 2-4% per month (24-48% annualized).

40.    Often the investment was memorialized in a "promissory note" or "agreement," held by the investor.  Sometimes, the investment was memorialized in an agreement that referred to the investment as a "joint venture." Regardless of the words used to describe the investment, the governing terms were substantively the same. This Complaint refers to the investment interests in KGTA as "KGTA Notes."

41.    Although the KGTA investment was sometimes called a "joint venture," investors – on information and belief – did not have any role in (or control of) the operation of KGTA and provided no services to KGTA.

42. The KGTA Notes were "securities" as that term is defined in Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10).

**Overview of the KGTA Ponzi Scheme**:

43. In marketing the KGTA Notes, both Abdallah and Grant met with prospective investors and described KGTA's business model.

44. In describing KGTA to investors, Grant and Abdallah represented that KGTA:

(a) had strategic relationships with customers looking to purchase crude oil and refined fuels;

(b) was able to purchase crude oil and refined fuel at a substantial discount;

(c) generated revenue by reselling the crude oil and refined fuel to KGTA's network of customers;

(d) would use investor funds to fulfill the purchase orders of their customers; and

(e) would use a portion of the revenue generated by the sale of crude oil and refined fuel to pay the guaranteed return to investors in the KGTA Notes.

45. Grant's and Abdallah's description of KGTA was false.

46. KGTA's purported fuel sales were fake. In reality, KGTA did not have the represented customer relationships, did not supply any oil products to customers and did not generate any revenue through the sale of crude oil or other fuel products.

47. Rather than paying investor returns through *bona fide* sales revenue, Grant and Abdallah operated KGTA as a Ponzi scheme. They used money raised from new investors to pay returns to old investors. They also pocketed a portion of investor funds for their own personal expenses and used a portion of investor's cash to pay fees to Defendants Gainer and Cicolani.

**Marketing of the KGTA Ponzi Scheme:**

48.     Most investors who bought KGTA Notes, were introduced to the investment by Defendant Jeffrey Gainer or Defendant Jerry Cicolani.

49.     Gainer and Ciolani are registered representatives with a Cleveland-based registered broker-dealer, Prime Solutions Securities, Inc. ("PSSI").

50.     Between October 2012 and March 2014. Gainer and Cicolani offered and sold the KGTA Notes to prospective investors. Gainer brought in at least 16 investors who invested $9.61 million in KGTA Notes. Cicolani brought in at least 41 investors who invested a total of $10.36 million in KGTA Notes.

51.     Gainer and Cicolani located prospective investors, met with them, provided information on KGTA's purported business, answered questions, and – if the individual decided to invest – obtained the investor's signatures on the related paperwork.

52.     In addition, Gainer typically set up meetings between the prospective investor and Grant and/or Abdallah, so that Grant and Abdallah could describe KGTA's business model and discuss the prospective investment "opportunity." No registration statement was on file or in effect for the offer and sale of the KGTA Notes.

53.     Grant and Abdallah – sometimes by themselves and sometimes with Gainer and Cicolani – also provided fabricated documents to prospective investors that gave the appearance that KGTA was a successful business that earned revenue through the sale of fuel products.

54.     For example, some investors were shown a fake tax return for KGTA that showed over $200 million in annual sales.

**KGTA's Investment Agreements**:

55.      Once an investor agreed to purchase a KGTA Note, the investor entered into an agreement with KGTA that provided the terms for the purported investment.  The agreement typically was called an "agreement" or "joint venture agreement" (the "Investment Agreement").

56.      In the Investment Agreement, KGTA represented – among other things – that:

      (a)  KGTA had introduced a "business opportunity to" the investor "for the purchase and resale of certain fuel oil";

      (b)  "KGTA has secured certain contracts, to purchase jet fuel, diesel fuel, and virgin oil at a significant profit";

      (c)  Investor funds would be placed in escrow and "[n]o funds shall be released from Escrow until such time as a firm Purchase Order from a bona fide third party purchaser has been received and accepted by KGTA";

      (d)  KGTA would "bear all market risk"; and

      (e)  Investors would be paid a guaranteed monthly investment return (typically ranging from 2-4% per month depending on the investor).

57.      In most cases, Grant signed the Investment Agreement on behalf of KGTA. In other instances, Abdallah signed the Investment Agreement on KGTA's behalf.

58.      The representations that Defendants KGTA, Grant and Abdallah made to prospective investors in the Investment Agreement were false when made.

59.      In reality, KGTA had not completed any sales of fuel products to customers and had no contracts or purchase orders to do so. Investor funds were not used to fulfill orders from "bona fide third party purchasers." Instead, funds were released from the escrow account directly to KGTA where the funds were then used to (a) pay purported

investment "returns" to other investors, (b) pay commissions to Gainer and Cicolani, and (c) for the personal use of Grant and Abdallah (including car payments, country club dues and over $200,000 of cash withdrawals).

60.     Defendants KGTA, Grant and Abdallah acted with scienter. At the time that they signed the Investment Agreements, Defendants KGTA, Grant and Abdallah knew, or recklessly disregarded, that the representations to investors identified in ¶ 56 above were false.  They knew, or recklessly disregarded, that KGTA had not bought or sold any fuel products, had not entered into contracts with (or received purchase orders from) *bona fide* third party purchasers, and that investor funds were not being transferred from (or returned to) the escrow account in the manner represented. Although they knew that these representations were false, Grant and Abdallah continued to execute Investor Agreements on behalf of KGTA and to raise money from investors.

61.     The misrepresentations identified in ¶ 56 above were material. In making an investment decision, a reasonable investor would consider it important that – rather than following the represented business model and safeguarding investor funds as promised – KGTA (a) was not generating revenue through fuel oil sales, (b) was paying investment "returns" with new investor principal, and (c) did not follow the represented escrow procedures.

**The Escrow Agreement**:

62.     In marketing the KGTA Notes to prospective investors, Defendants Grant, Abdallah, KGTA, and attorney Mark George promised investors a critical safeguard: payments and returns would be cleared through an escrow held in Defendant George's IOLTA account.

63. In connection with buying a Note, investors entered into an "Escrow Agreement," with KGTA and Defendant George who acted as the Escrow Agent.

64. The Escrow Agreement – signed by George and KGTA – typically represented that KGTA transactions would proceed as follows:

> (a) The investor's investment principal would be deposited with Defendant George as Escrow Agent;
>
> (b) Defendant George then would hold the investment funds and disperse the funds "solely for the purpose of purchasing fuel oil";
>
> (c) George then would disburse funds from escrow only to pay invoices for the purchase of fuel by KGTA (and related expenses);
>
> (d) KGTA would make arrangements to ensure that proceeds from its resale of fuel oil would be sent "directly to the Escrow Agent"; and
>
> (e) George would then distribute the proceeds by first paying the investor the promised return and – after investors received their return – paying the balance, if any, to KGTA.

65. Each Escrow Agreement was signed by Defendant George as Escrow Agent and by Grant and/or Abdallah on behalf of KGTA.

66. The Escrow Agreement was marketed as a safeguard for investors. As represented, the escrow arrangement provided significant antifraud protection as it effectively separated KGTA from the investor's principal and from its own income stream. The Escrow Agent – not KGTA – was supposed to control the money flow. The payments from escrow would be made by George to third parties upon presentation of the proper invoice. Likewise, investment returns would come directly from the proceeds of the oil sale; George would not pay KGTA until after investors received their returns.

67. As represented, this escrow structure – purportedly monitored and controlled by Defendant George as Escrow Agent – would have served three critical goals. The escrow

would have (a) provided a monitoring mechanism so that the Escrow Agent and investors could confirm that the underlying oil sales were real; (b) allowed investors to monitor performance of the underlying sales; and (c) ensured that investor funds were being used as represented – *i.e.* to fund the purchase of oil and fuel for eventual resale – rather than being siphoned off for some other purpose.

68.     In reality, the escrow agreements were a sham and the statements in the Escrow Agreements identified in ¶ 64 were false when made.

69.     Unbeknownst to investors, George and KGTA completely disregarded the escrow arrangement.  George did not hold the investors' funds in his IOLTA account pending the submission of invoices, or direct payments to third parties to pay off the invoices.  Instead, George ceded control of investor assets to KGTA, routinely wiring investor funds directly to KGTA's account at a different bank.

70.     Rather than confirm each transaction with an invoice, George often wired money to KGTA whenever Grant or Abdallah requested it.  George wired approximately $19.5 million to KGTA's accounts between November 2012 and February 2014.

71.     While shirking his responsibilities under the Escrow Agreement, George paid himself approximately $63,000 in fees from the IOLTA account between October 2012 and March 2014, and KGTA paid him another $32,000 during that same time period. Neither George nor KGTA disclosed these fees to investors.

72.     The provisions of the Escrow Agreements relating to the proceeds of oil sales also were not followed.  According to the Escrow Agreements, proceeds from KGTA's oil sales should have been paid directly into George's IOLTA account. George then was supposed to control the disbursements, paying investor returns from the IOLTA account

14

before sending any excess to KGTA. But George's IOLTA account never received the proceeds of any oil sales. Moreover, all investors received their monthly return checks directly from KGTA's account – not from the IOLTA account.

73. In sum, George and KGTA did not implement the safeguard that they had promised. George, Grant, Abdallah and KGTA acted with scienter. They each knew, or recklessly disregarded, that the procedures promised in the Escrow Agreement were not being followed. Nevertheless, they continued to enter into Escrow Agreements with investors, representing that the escrow safeguard would be employed.

74. The misrepresentations related to the Escrow Agreement were material. In making an investment decision, a reasonable investor would find it important that – rather than following the procedures that were designed to safeguard the investment – George, Grant, Abdallah, and KGTA were ignoring the terms of the Escrow Agreement, effectively neutralizing this important anti-fraud protection.

**Defendants KGTA, Grant, Abdallah, Gainer and Cicolani Offered and Sold Unregistered Securities:**

75. In addition to committing fraud by running a Ponzi scheme and making material misrepresentations to investors, Defendants KGTA, Grant, and Abdallah (along with Defendants Gainer and Cicolani) also engaged in the unlawful unregistered offer and sale of securities.

76. The KGTA Notes were "securities" as that term is defined in Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10).

77. As discussed in ¶¶ 38 - 54 above, Defendants KGTA, Grant, Abdallah, Gainer and Cicolani offered and sold KGTA Notes to investors in unregistered transactions.

15

78.     No registration statement was ever filed or in effect for the offer or sale of the KGTA Notes to investors.

79.     The offers and sales of the KGTA Notes by Defendants KGTA, Grant, Abdallah, Gainer and Cicolani were not exempt from the registration requirements of federal securities law.

**Defendants Gainer and Cicolani Acted as Unregistered Brokers By "Selling Away" From Their Employer:**

80.     Between November 2012 and March  2014 – while they were selling KGTA Notes to investors – Gainer and Cicolani were registered representatives of PSSI, a broker-dealer.

81.     However, Gainer and Cicolani did not sell the KGTA Notes through PSSI. Instead, they engaged in a practice called "selling away"; they hid the KGTA transactions from their employer, failed to follow PSSI's policies and procedures regarding the sale of private placements like the KGTA Notes, sold the KGTA Notes outside of their role as employees of PSSI and kept the resulting fees for themselves.

82.     At all times relevant to this Complaint, PSSI had a compliance manual and other written policies which it distributed to all of its registered representatives, including Defendants Gainer and Cicolani. The compliance manual detailed PSSI's policies and procedures governing the offer and sale of securities by its registered representatives.

83.     Among other policies, PSSI required its registered agents to seek permission from PSSI before selling interests in private placements – such as the KGTA Notes.

84.     In addition, for any approved sale of interests in a private placement, PSSI required (1) the preparation of an offering memorandum, (2) the issuer's filing with the SEC of a disclosure form for any offering sold under Exchange Act Regulation D, and (3) the

submission of offering documents to the Financial Industry Regulatory Authority ("FINRA").

85.     PSSI's compliance manual also mandated that due diligence be performed for each private placement sold to investors.

86.     PSSI's compliance manual identified numerous steps that could be taken to comply with the due diligence mandate, including (a) a review of financial reports, (b) independent verification of management's representations, (c) a review of news articles and industry publications regarding the issuer, (d) a review of the company's operating plans, product literature, corporate records, financial statements, contracts, and lists of distributors and customers, (e) a physical inspection of the issuer's facilities, (f) contact with the issuer's auditor, and (g) obtaining written assurances as to the accuracy of records and financial statements.

87.     Gainer and Cicolani did not comply with PSSI's policies and procedures for the marketing and sale of private placements to investors.

88.     First, Gainer and Cicolani never disclosed to PSSI that they were offering and selling the KGTA Notes to investors.

89.     To the contrary, Gainer and Cicolani actively tried to hide from their employer the fact that they were offering and selling interests in KGTA.

90.     For example, they each submitted annual disclosures to PSSI certifying that were not engaged in any outside business activities.

91.     In addition, on November 12, 2012, an investor emailed Gainer at his PSSI email address to set up a lunch meeting with Grant and "a couple of friends that have some interest in the oil investment."  Gainer responded from his personal AOL email account

admonishing the investor: "P[l]ease DELETE Jgainer@pssinet.com[,] the email address you used for me today as that is for my securities business."  Gainer asked the investor to use his personal e-mail address for future correspondence.

92.    <u>Second</u>, there was no offering memorandum for the KGTA Notes, and no filings of any sort were made with the SEC or FINRA regarding the KGTA Note offering.

93.    <u>Third</u>, Gainer and Cicolani did not comply with PSSI's due diligence procedures.

94.    As KGTA had no facilities, employees, customers, suppliers, or financial statements, the KGTA Note offerings could not have withstood any attempt at third-party verification.

95.    By "selling away" the KGTA Notes – *i.e.*, selling the Notes to investors directly rather than through their broker-dealer employer – Gainer and Cicolani acted as unregistered brokers in violation of Exchange Act Section 15(a).

**<u>Gainer and Cicolani Defrauded Investors By Hiding Their Compensation:</u>**

96.    Gainer and Cicolani reaped huge benefits from the KGTA Ponzi scheme.

97.    KGTA paid Gainer and Cicolani a fee for each KGTA Note sold.

98.    KGTA typically paid a gross 5% monthly (60% annualized) "return."  For each investor they brought in, Gainer and Cicolani took a portion of that 5% gross return as their fee and passed the remainder to the investor that they recruited into the scheme.

99.    Most of Gainer's investors received 4% of that gross monthly return, with Gainer taking the remaining 1% as his fee.

100.    In addition, KGTA paid Gainer a monthly bonus of 0.67% of the aggregate amount invested by all of his investors.

101.    From October 2012 through March 2014, Gainer has been paid approximately $2 million in fees for offering and selling KGTA Notes to investors.

102.    Cicolani's fees were even more significant. Investors who purchased KGTA Notes through Cicolani typically received a 2% monthly return, leaving Cicolani with a 3% per month fee.

103.    In other words, for an investor who worked with Cicolani, Cicolani typically received more in fees than the investor received in returns.  In fact, in one case, an investor who invested $1.5 million received a 1% monthly return (12% annually), while Cicolani received 4% a month in fees (48% annually).

104.    From October 2012 through March 2014, Cicolani has been paid over $4 million in fees for offering and selling KGTA Notes to investors.

105.    This fee structure created an adverse relationship between the interests of investors on the one hand and Gainer and Cicolani on the other hand. There was a zero-sum game between their fees and the investors' returns. The more Gainer and Cicolani earned in fees, the less would be paid to investors as a return.

106.    Nevertheless, Gainer and Cicolani did not disclose that zero-sum game to investors and continued to offer and sell KGTA Notes while keeping their compensation hidden.

107.    In marketing and selling the KGTA Notes, Gainer and Cicolani did not disclose to prospective investors that (a) they were receiving a fee from KGTA for each investor they brought in, (b) the amount of the fee, (c) that their fee bore an inverse relationship to the investor's monthly return, and, therefore, (d) Gainer and Cicolani had the ability to increase their compensation at the investor's expense.

19

108.    In addition, by not disclosing their compensation, Gainer and Cicolani hid the overall purported return of the KGTA Notes – 5% per month (60% per year). Such an astronomical, guaranteed return would have been a prominent "red flag" to investors – a tell-tale sign that the KGTA Notes were a sham.

109.    Gainer and Cicolani knowingly, recklessly, or (alternatively) negligently disregarded that they had not disclosed their compensation, their resulting ability to benefit at investors' expense or the unbelievable 5% gross monthly "return" from the KGTA Notes.

110.    Information related to Gainer's and Cicolani's compensation was material. In making an investment decision, a reasonable prospective investor would have found it important that (a) the individuals selling them the KGTA Note received a fee that had an inverse relationship to the investor's return and (b) taking those fees into account, the KGTA Notes had a guaranteed gross annual return of 60% -- a rate that would have been a signal to investors that the KGTA investment was simply too good to be true.

**Gainer and Cicolani Recklessly Engaged in a Fraudulent Scheme By Selling The KGTA Notes Despite "Red Flags" Signaling That KGTA Was A Fraud:**

111.    Both Gainer and Cicolani have significant experience in the securities industry. Both were registered representatives with a registered broker-dealer. Gainer had worked in the securities industry since 2001. Cicolani had worked in the securities industry since 1991.

112.    Despite that experience, Gainer and Ciolani acted recklessly when, despite the presence of prominent "red flags," they encouraged investors to invest in KGTA, described KGTA's business, and assured investors that KGTA was a successful company.

113.    At the time they sold the KGTA Notes, Gainer and Cicolani knew that KGTA was promising a gross monthly "return" of 5% per month (60% annualized).

Moreover, they knew that investors were being promised that their return was guaranteed and that KGTA would assume all market risk.

114.    Any financial industry professional with the experience of Gainer and Cicolani would have known that such an exorbitant, guaranteed return is too good to be true and is the likely hallmark of an offering fraud.

115.    Gainer and Cicolani also recklessly disregarded other "red flags" that reflected that the investment was a sham, including:

> (a) Exorbitant compensation, that equaled approximately 29% of all investor funds received;
>
> (b) Fees that sometimes exceeded the "returns" due investors; and
>
> (c) Despite presenting itself as a successful oil trading firm, KGTA had no employees or operations beyond Grant and Abdallah working out of their home offices.

116.    Gainer and Cicolani blindly relied on representations made by Grant and Abdallah.  They made no attempt to independently investigate whether the KGTA "opportunity" was legitimate.

117.    Had Gainer and Cicolani conducted even a basic internet search, they would have learned that, in 2007, Abdallah was convicted of money laundering and had two state tax evasion felonies. They also would have discovered that, in 2009, Grant entered into a consent cease-and-desist order with the Colorado Securities Commission barring him from selling unregistered securities.

118.    Additionally, even a cursory independent investigation would have revealed that KGTA had no financial statements, offices, facilities, or employees (other than Grant and Abdallah).

119.     Despite those "red flags" and their lack of any investigation of the KGTA "opportunity," Gainer and Cicolani offered and sold the KGTA Notes to investors in reckless disregard of the truth of the statements they made to investors about KGTA's business and the KGTA Notes themselves.

120.     In doing so, Gainer and Cicolani recklessly engaged in a fraudulent scheme by selling bogus KGTA Notes to investors.

**Gainer's and Cicolani's Fees Were Paid to Relief Defendants**

121.     KGTA did not pay Cicolani and Gainer their fees directly. Rather, KGTA typically paid the fees to limited liability companies owned by Gainer's wife and Cicolani's girlfriend.

122.     Between October 2012 and February 2014, Relief Defendant NATG (owned by Relief Defendant Nancy Gainer) received over $1.6 million from KGTA.

123.     During the same period, Relief Defendant Turnbury (owned by Cicolani's girlfriend, Relief Defendant Kelly Hood) received over $3.5 million from KGTA.

124.     The proceeds identified in ¶¶ 122-123 that were paid to NATG and Turnbury are the proceeds of the securities violations committed by Defendants Cicolani and Gainer as described in this Complaint.

125.     Relief Defendants Nancy Gainer, NATG, Kelly Hood, and Turnbury have no legitimate claim to the amounts received from KGTA.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### (Against Defendants Abdallah, Grant and KGTA)

126.     Paragraphs 1 through 125 are realleged and incorporated by reference as though fully set forth herein.

127.    By engaging in the conduct described in ¶¶ 33 - 74 above, Grant, Abdallah, and KGTA in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly, employed devices, schemes and artifices to defraud.

128.    Defendants Grant, Abdallah, and KGTA intentionally or recklessly engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above. Grant, Abdallah, and KGTA knew, or recklessly disregarded, that – rather than using investor cash to fund *bona fide* oil deals– investor funds were being used to (a) pay disguised "returns" to other investors, (b) pay fees to Cicolani and Gainer, and (c) for personal expenses of Grant and Abdallah.

129.    By reason of the foregoing, Defendants Grant, Abdallah and KGTA violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Grant, Abdallah and KGTA)

130.    Paragraphs 1  through 125 are realleged and incorporated by reference as though fully set forth herein.

131.    By engaging in the conduct described in ¶¶ 33 - 74 above, Defendants Grant, Abdallah and KGTA, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

     a. obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

     b. engaged in transactions, practices, or courses of business that operated

or would operate as a fraud or deceit upon the purchasers of such securities.

132.    Defendants Grant, Abdallah and KGTA made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

133.    By reason of the foregoing, Defendants Grant, Abdallah and KGTA have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 (Against Abdallah, Grant and KGTA)

134.    Paragraphs 1 through 125 are realleged and incorporated by reference.

135.    As more fully described in paragraphs 33 through 74, Defendants Grant, Abdallah and KGTA, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

136.    Defendants Grant, Abdallah and KGTA knew, recklessly disregarded, the facts and circumstances described in paragraphs 33 through 74.

137. By reason of the foregoing, Defendants Grant, Abdallah and KGTA violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT IV
### Violation of Section 17(a)(2) of the Securities Act
### (Against Defendant George)

138. Paragraphs 1 through 125 are realleged and incorporated by reference.

139. By engaging in the conduct described in ¶¶ 62-74 above, Defendant George, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140. Defendant George made the untrue statements and omissions of material fact described in ¶ 64 above.

141. By reason of the foregoing, Defendant George has violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT V
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against Defendant George)

142. Paragraphs 1 through 125 are realleged and incorporated by reference.

143. As identified in paragraphs 62 through 74, Defendant George, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: made untrue statements of material fact and omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

144.     Defendant George knew, recklessly disregarded, the facts and circumstances described in paragraphs 62 through 74.

145.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. 240.10b-5(b)].

### COUNT VI
### Violation of Section 5(a) and 5(c) of the Securities Act
### (Against Defendants KGTA, Grant, Abdallah, Gainer and Cicolani)

146.     Paragraphs 1 through 125 are realleged and incorporated by reference.

147.     As described in more detail above at ¶¶ 43-54 and ¶¶ 75-79, Defendants KGTA, Grant, Abdallah, Gainer and Cicolani offered and sold KGTA Notes to investors and/or were substantial factors or necessary participants in the offer and sale of KGTA Notes to investors.

148.     The KGTA Notes were "Securities" as that term is defined in Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

149.     Defendants KGTA, Grant, Abdallah, Gainer and Cicolani used the mails and other interstate means to facilitate the offer and sale of KGTA Notes.

150.     None of the offerings or sales of KGTA Notes were registered with the Commission. At all times relevant to this Complaint there was no registration statement on file or in effect as to the KGTA Notes.

151.     The offers and sales of KGTA Notes to investors by Defendants KGTA, Grant, Abdallah, Gainer and Cicolani were not exempt from the registration requirements of federal securities law.

## COUNT VII
### Violation of Section 15(a)(1) of the Exchange Act
### (Against Defendants Gainer and Cicolani)

152.  Paragraphs 1 through 125 are realleged and incorporated by reference.

153.  From November 2012 through March 2014, Defendants Gainer and Cicolani by the conduct described in ¶¶ 80-95 above, namely the sale of KGTA Notes to investors – directly and indirectly, made use of the mails and means and instrumentalities of interstate commerce to effect transactions in, and induced or attempted to induce the purchase and sale of securities, without being properly registered with the Commission as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

154.  By reason of the conduct described above, Gainer and Cicolani violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT VIII

### Violation of Section 17(a)(1) of the Securities Act
### (Against Defendants Gainer and Cicolani)

155.  Paragraphs 1 through 125 are realleged and incorporated by reference as though fully set forth herein.

156.  By engaging in the conduct described in ¶¶ 111-120 above, Defendants Gainer and Cicolani in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly, employed devices, schemes and artifices to defraud.

157.  Defendants Gainer and Cicolani intentionally or recklessly engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

158.    By reason of the foregoing, Defendants Gainer and Cicolani violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT IX
### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Defendants Gainer and Cicolani)

159.    Paragraphs 1 through 125 are realleged and incorporated by reference.

160.    By engaging in the conduct described in ¶¶ 96-120 above, Defendants Gainer and Cicolani, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

    a.    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b.    engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

161.    Defendants Gainer and Cicolani made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

162.    By reason of the foregoing, defendants have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT X

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5
### (Against Gainer and Cicolani)

163.    Paragraphs 1 through 125 are realleged and incorporated by reference.

164.    As more fully described in paragraphs 96 through 110, Defendants Gainer and Cicolani, in connection with the purchase and sale of securities, by the use of the means

and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

165.    Defendants Gainer and Cicolani knew, or recklessly disregarded, the facts and circumstances described in paragraphs 96 through 110.

166.    By reason of the foregoing, Defendants Gainer and Cicolani violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT XI
### (Relief Defendants)

167.    Paragraphs 1 through 125 are realleged and incorporated by reference.

168.    Between October 2013 and March 2014, KGTA transferred investor principal to Relief Defendants Nancy Gainer, NATG, Kelly Hood, and Turnbury. These transfers reflected purported fees due Defendants Gainer and Cicolani for their offer and sale of KGTA Notes to prospective investors.

169.    Between October 2012 and February 2014, NATG (owned by Defendant Gainer's wife, Nancy Gainer) received over $1.6 million from KGTA.

170.    During that same period, Turnbury (owned by Cicolani's girlfriend, Kelly Hood) received over $3.5 million.

171.   The proceeds paid to NATG and Turnbury identified in ¶¶ 122 - 123 above are the proceeds of the securities violations committed by Defendants Cicolani and Gainer as described in this Complaint.

172.   Relief Defendants Nancy Gainer, NATG, Kelly Hood, and Turnbury have no legitimate claim to the amounts received from KGTA.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Grant, Abdallah and KGTA, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Enter an Order of Permanent Injunction restraining and enjoining Defendant George, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal

service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

## IV.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Gainer and Cicolani, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j and 78o(a)] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

## V.

Issue an Order requiring Defendants and Relief Defendants to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

## VI.

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

31

## VII.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

The Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: */s/      Robin Andrews*
Timothy S. Leiman (IL No. 6270153)
Charles J. Kerstetter (PA No. 67088)
Robin Andrews (IL No. 6285644)
Christopher H. White (IL No. 6280031)

Attorneys for Plaintiff
**U.S. SECURITIES AND
  EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390

Dated: May 29, 2014